FILED
CLERK

12:01 pm, May 14, 2018

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
--------------------------------------------------------X
ROBERT CINCOTTA,

                        Plaintiff,                          **MEMORANDUM OF**
                                                            **DECISION & ORDER**
                -against-                                    2:15-cv-04821 (ADS) (AKT)

HEMPSTEAD UNION FREE SCHOOL
DISTRICT, BETTY J. CROSS, WAYLYN
HOBBS, JR., SHELLEY BRAZLEY,
BRANDON V. RAY, JOANN SIMMONS,
SUSAN JOHNSON,

                        Defendants.
--------------------------------------------------------X

<u>**APPEARANCES:**</u>

**Leeds Brown Law P.C.**
*Attorneys for the Plaintiff*
1 Old Country Road
Suite 347
Carle Place, NY 11514
        By:    Sean M. O'Hara, Esq., Of Counsel

**The Scher Law Firm, LLP**
*Attorneys for the Defendants*
1 Old Country Road
Suite 385
Carle Place, NY 11514
        By:    Austin R. Graff, Esq., Of Counsel

**SPATT, District Judge**:

        The Plaintiff Robert Cincotta (the "Plaintiff") brought this federal discrimination action

against the Defendants Hempstead Union Free School District ("HUFSD" or the "District"), Betty

J. Cross ("Cross"), Waylyn Hobbs, Jr. ("Hobbs"), Shelley Brazley ("Brazley"), Brandon V. Ray

("Ray"), Joann Simmons ("Simmons"), and Susan Johnson ("Johnson," together with Cross,

Hobbs, Brazley, Ray, and Simmons, the "individual Defendants") (collectively, the "Defendants"),

alleging that they violated 42 U.S.C. § 1983 ("Section 1983") by discriminating against him based on his race and gender when they, *inter alia*, excessed his position as Director of Athletics, Physical Education and Health at the District.

Presently before the Court is a motion by the Defendants for summary judgment pursuant to Federal Rule of Civil Procedure ("FED. R. CIV. P." or "Rule") 56. For the following reasons, the Defendants' motion is granted in part, and denied in part.

## I.  BACKGROUND

### A.  Summary of the Relevant Facts

The following facts are drawn from the parties' Local Rule 56.1 statements.

The Plaintiff is a white male, and was born on August 6, 1958. The Plaintiff began working for the District in 1985. He became the Director of Athletics and Physical Education for the District in 2008, and was granted tenure on that position on September 1, 2008. He worked in that position until June 20, 2013, when the Board of Education of the Hempstead Union Free School District (the "Board") voted to excess his position. He eventually returned to the position of Director of Athletics and Physical Education on August 31, 2015 after the Board recalled him. The new position had a broader title, making the Plaintiff the Director of Athletics, Physical Education, Health and Chairperson Districtwide Health and Safety Team.

Johnson became interim Superintendent for the District on November 3, 2012, and Superintendent of Schools on December 7, 2012. Cross, Hobbs, Brazley, Ray, and Simmons were members of the Board during the relevant period. Among other duties, one of the Board's responsibilities is to approve or reject the Superintendent's proposed budget. At issue here is one of the Superintendent's proposed budgets that was approved by the Board—the 2013–14 budget, which excessed the Plaintiff's position.

### 1. The 2013–2014 Budget

Leading up to the Board's June 20, 2013 vote to excess the Plaintiff's position, the District was under financial stress. As the New York State Office of the State Comptroller noted in a 2016 report on school years 2012-13 and 2014-15, "the Hempstead School District[] [] has experienced substantial increases in fiscal stress for two years in a row. . . . Hempstead's increasing operating deficits and declining fund balances have contributed to its increase in fiscal stress." (Defs.' 56.1 ¶ 5).

On November 26, 2012, Johnson issued a memorandum to administrators stating that the District had started the budget development process for the 2013–14 school year. The Plaintiff, along with the administrators to whom the memorandum was addressed, met individually with Johnson and the Assistant Superintendent for Business. Administrators, including the Plaintiff, also had to complete budget forms and supply supporting information regarding their areas of administration. When the Plaintiff met with Johnson sometime in late 2012, she did not inform him that she was planning to excess his position.

In January 2013, during a closed-door budget session, Johnson informed the Board that she was recommending that several jobs in the District be excessed, including the position the Plaintiff held at the time, Director of Athletics, Physical Education, and Health. While Johnson made the recommendations, she testified that principals could propose excessing administrators. There is no evidence as to whether any principal ever proposed excessing the Plaintiff's position. Johnson never spoke about the Plaintiff with the Board after the January 2013 budget meeting.

In April of 2013, Johnson told the Plaintiff that she would be recommending to the Board that his position be excessed. The Plaintiff told her that she could not do that because his position was mandated by the State.

On April 18, 2013, Johnson submitted a proposed budget to the Board.  She did not supply any other materials to the Board.  The proposed budget, *inter alia*, removed the Plaintiff's position; the Director of Mathematics; the Principal for the Math & Science Academy; the Principal for the Music & Art Academy; the Principal for the Business & Law Academy; and the Principal for the Business & Law Academy.  The Board members discussed the proposed budget only with other Board members.

The District also moved the salaries of several of the "director" positions from the District's General Fund, which is its primary operating budget, to positions funded by grants from the state and federal government.  The funds from those grants can only be used for specific purposes.  For instance, the salaries for the Directors of Mathematics, Science, and Social Studies were moved into the Title II grant fund.  The salary for the Executive Director for Social Improvement & Accountability was moved into the Title I grant fund.  Johnson submitted an affidavit which stated that it was her understanding, and that she was advised, that those positions could be funded through Titles I and II because they specifically related to "increasing academic achievement" of students, while the physical education and athletics departments did not relate to increasing that achievement.

NYS' guidance on Title I expenditures states that Title I funds cannot be used on "teachers providing core instruction."  TITLE I, Part A: IMPROVING BASIC PROGRAMS OPERATED BY LOCAL EDUCATIONAL AGENCIES Guidance on Allowable and Unallowable Expenditures, available at http://www.nysed.gov/common/nysed/files/2017-18-title-i-a-allowable-unallowable-.pdf (last visited Apr. 24, 2018).  The State's guidance on Title II expenditures states that Title II funds can be used for "recruitment and retention initiatives such as signing bonuses, relocation costs, recruitment materials, salary differentials or incentive pay,

certification or licensure costs contracted professional development providers." TITLE II, Part A: SUPPORTING EFFECTIVE INSTRUCTION Guidance on Allowable and Unallowable Expenditures, available at http://www.nysed.gov/common/nysed/files/2017-18-title-iia-allowable-unallowable.pdf (last visited Apr. 24, 2018). As the Plaintiff points out, high school graduates are required to take at least two credits of physical education, and half a credit of health education.

During the April 18, 2013 Board meeting, the Board approved the Superintendent's proposed budget for the 2013–14 school year, in the amount of $178,86,836. The notes from the meeting indicate that the Board approved the Superintendent's recommendation to terminate the elementary school principal, the Principal for the Math & Science Academy; the Principal for the Music & Art Academy; the Principal for the Business & Law Academy; the Director of Technology; and the Director of Science. Before the 2013–14 school year, the District had four separate preparatory academies in the high school. The principals of each of the schools were terminated, and the schools were consolidated into a single school with a single principal. The Court notes that the minutes for the April 18, 2013 Board meeting do not mention that the Plaintiff or his position were being excessed. However, as stated above, the proposed budget shows that no money was being allocated to that position for the 2013–14 school year.

Ray testified in his deposition that that, when evaluating the 2013-14 budget, they never discussed the budget concerning the position of director of athletics and physical education, they merely discussed getting the budget to a number that would increase it less than 2% from the previous year. According to N.Y. EDUCATION LAW §2023-a, schools are to maintain a budget increase of less than two percent each year. However, the budget for 2013-14 increased the

District's budget by 2.99% compared to the previous year. Simmons testified that the budget was the reason for the Plaintiff's termination.

On May 7, 2013, the Board-approved budget for the 2013-14 year was made available to the public. The Plaintiff eventually received a copy of the budget.

On May 21, 2013, the District voters approved the 2013–14 school budget that had been previously approved by the Board.

Johnson wrote a letter to the Plaintiff on May 30, 2013 in which she told him that she would be recommending to the Board that the District terminate his position and that he be excessed due to budgetary constraints. The letter further informed him that he would be placed on a preferred eligibility list for seven years, during which time he would have the right to be recalled within his area of employment.

On June 20, 2013, pursuant to Johnson's recommendation, and in line with the proposed budget approved by the District's voters, the Board voted to terminate fourteen District personnel due to excessing. The Board voted for the fourteen terminations together at once by voting on a "consent docket." The Plaintiff's position was the only District administration position terminated, and the only position which was mandated by the State. *See* N.Y. Comp. Codes R. & Regs. tit. 8 § 135.4(b)(4)(iii) ("Each school district operating a high school shall employ a director of physical education who shall have certification in physical education and administrative and supervisory service.") Five of the professionals who were excessed on June 20, 2013 were recalled on August 7, 2013.

Plaintiff's position was not a specific topic of discussion among the members of the Board, but as the Plaintiff repeatedly points out, the Board's budget sessions were typically held in executive sessions, meaning there is no record of what was said. Furthermore, the Board did not

consider tenure when deciding which positions to excess. To that end, the Board merely considered Johnson's recommendations. The Board was not given any information regarding the Plaintiff other than the fact that his name was included on the excess list. The Board did not question Johnson's recommendation, and she did not discuss the recommendation with the Board.

On June 24, 2013, the Plaintiff received a letter from Johnson's office informing him that the Board had approved Johnson's recommendation to terminate his position as a result of excessing.

## 2. The Board Members

The Plaintiff testified that he did not have any information that Brazley, Ray, Hobbs, or Simmons voted to excess him because of his race. As to Cross, the Plaintiff testified that she referred to him as "being white, [] being a Massapequa guy and not being a Hempstead guy, and over the years she thought I had hurt kids because I . . . had checked their grades and I wasn't helping them enough to get into college, and she made a number of statements over the years." (Defs.' 56.1 ¶ 73). He further said that she screamed at him at a basketball game, saying that he and two African American coaches should be fired. Cross apparently also told the Plaintiff that he did not do any work, that he was merely an overseer "who stands around and watches the black kids play." (Pl.'s 56.1 ¶ 64). Cross testified that as many as ten people had claimed that the Plaintiff was a racist.

Similarly, the Plaintiff testified that he did not have any evidence that the Board members approved the excessing of his position based on his age, but that it was his "perception" that his age played a part in their process. He also said that Ray had been a student of his, so Ray therefore knew that the Plaintiff was "up in age." (*Id.* ¶ 74).

As to the Superintendent, the Plaintiff testified that he was never harassed by Johnson, because

> [he] did not have a lot of dealing with Ms. Johnson. The []pattern of harassment came with people that were closely associated with Ms. Johnson, including, among them, her special assistant Robin Brazley, who called [him] a racist, and other members of the staff who responded to Ms. Johnson, Tina Lake ["Lake"], Annette Greer ["Greer"] and various other people that worked in the district who would make -- who would make derogatory comments about [him] in terms of [his] race, in terms of [his] age, in terms of -- of any number of things.

(Defs.' 56.1 ¶ 76). Robin Brazley was an assistant to Johnson, and is Defendant Brazley's sister. Robin Brazley did not make any policy decisions. Lake was a Community Aide, who was responsible for community relations and parent advocacy. Greer was a parent of a student in the District. The Plaintiff asserts that because Lake and Greer had access to the Superintendent, they were able to influence policy decisions. They were often seen in the Superintendent's office, and allegedly told Johnson that the Plaintiff needed to go.

In February of 2013, after the Plaintiff informed several players that they were academically ineligible to play, Robin Brazley called the Plaintiff. She called him a racist and said that he was hurting black kids, and told him to stay in his office so that Johnson could "straighten him out." (*Id.* ¶ 88). Johnson testified that she was unaware of this conversation.

The Plaintiff did not report these individuals' statements, but testified that he did not do so because he feared retribution. Jean Collins ("Collins"), who worked as a secretary in the District during the relevant time, also testified that she feared retaliation because "that's what the District does, they retaliate." (Pl.'s Ex. 8 at 49).

The Plaintiff testified that Assistant Superintendent Stephanie Clagnaz apparently told the Plaintiff that individuals had made comments about his race and his age. Johnson testified that

she had never heard anyone discuss the Plaintiff's race or age, or that he was a racist. Furthermore, she stated that she never had any conversations with Lake or Greer about the Plaintiff.

However, in January 2013, the Plaintiff complained about Lake to Dr. Rodney Gilmore, who was both the Plaintiff's direct supervisor and the Director of Human Resources,. Specifically, the Plaintiff complained that Lake had told the Boys' Basketball Coach, to use players who were academically ineligible. Dr. Gilmore apparently put his fingers to his lips and "shushed' the Plaintiff.

Plaintiff testified that he believed Johnson recommended his excessing based on his age because there were individuals who worked closely with her who said that he was too old to perform his job.

### 3. The Plaintiff's Tenure as Director of Physical Education, Athletics, and Health

The Plaintiff received positive performance evaluations during his tenure as Director of Athletics, Physical Education and Health, and was never disciplined.

In September 2012, while at a football game, the Plaintiff had to go the press box because of the heat. Head custodian Curtiss Hewitt, and cheerleading advisors Elyse Nicholson ("Nicholson") and Lake told him that he was too white to be out in the sun, that he could not take the heat, and that he needed to be black like them.

In February 2013, pursuant to a District requirement that athletes maintain a certain grade to be eligible to participate in sports, the Plaintiff informed several coaches that some of their athletes were ineligible to play because they were failing two or more classes. The Plaintiff also told the principals and the assistant superintendents for curriculum. Robin Brazley called the Plaintiff, and accused him of being a racist. She said that he was trying to hurt black kids, and told

him to stay in his office so that the Superintendent could "straighten him out." Johnson testified that she was unaware of Robin Brazley's statements, and did not condone or approve of them.

According to the Plaintiff, Johnson came to his office and told him that "her" team was going to play regardless of what the Board of Education's policy regarding academic policy said. Johnson told him to do his job, and that the kids were going to play. Johnson stated in an affidavit that the policy did not come from the District, but instead from a handbook created by the Plaintiff. The Plaintiff claims that there is a District policy, but did not supply the policy to the Court.

Johnson testified that this conversation took place while the players, including certain ones the Plaintiff had deemed ineligible, were sitting on a bus waiting to go to a game. She told the Plaintiff that her concern was that the Plaintiff had only just determined right before the game that the players were ineligible. She told him to do his job and track eligibility properly. She allowed the bus to leave, and that if they had to forfeit games they would do so, but the decision should be made in a timely fashion. The Plaintiff claims that this conversation never took place, and that the players were in the hallway with Lake and Greer.

On June 5, 2013, after the Board had preliminarily approved the 2013–14 school year budget, and after Johnson had told the Plaintiff via letter that she would be recommending to the Board that his position be excessed, the District's Athletics Department hosted their annual sports awards dinner. The Plaintiff apparently heard Cross ask Collins about the Plaintiff's age and length of District service. Collins purportedly told her that the Plaintiff needed two more years to retire, and Cross responded that they had to get rid of him. Simmons was apparently present for the conversation as well, and she said that she did not have any problems with the Plaintiff.

**4. Individuals Hired to Replace the Plaintiff and the District's Subsequent Savings**

Under the 2012–13 budget, the Director of Physical Education, Health and Athletics was paid $144,975. Under the 2013–14 budget, the position was excessed. Dr. Johnetta Hill ("Hill") was assigned to oversee the District's athletics department. Hill was given these duties in addition to her responsibilities as Assistant Principal and/or interim Principal. This assignment was done by Johnson, and did not require Board approval. Hill is an African-American woman who was born on October 9, 1952, and is therefore approximately six years older than the Plaintiff. Hill holds a School District Administrator Permanent Certificate; a Physical Education Certificate; a Health Permanent Certificate; and a Recreation Permanent Certificate. Hill did not receive any additional salary for her responsibilities overseeing the athletics department beyond her Assistant Principal/interim Principal salary.

Johnson further recommended that Barbara Intrieri ("Intrieri") be appointed to oversee the District's physical education program. Intrieri is Caucasian, and was born on December 19, 1960, and is therefore two years and four months younger than the Plaintiff. On September 19, 2013, the Board approved Intrieri's appointment to the position of Director of Physical Education at a salary of $118,563. Prior to her appointment, Intrieri had served as a physical education teacher where she earned $103,401. At the same meeting, the Board appointed Elyssa Pascarella ("Pascarella") to replace Intrieri as a physical education teacher and to pay her $59,010. Pascarella is Caucasian. When she did not return for the 2014–15 school year, she was replaced by Elliot Miller, an African American, who earned $52,029 that year. During the 2014–15 school year, Intrieri earned $122,045.

Intrieri also served as the Assistant Coordinator of State and/or Federally Aided Programs and the Chairperson of the District's Safety Committee during the 2013–14 and 2014–15 school

years. Intrieri stated in an affidavit that her responsibilities overseeing the physical education program accounted for forty percent (40%) of her time. The Plaintiff countered in an affidavit that his responsibilities as Director of Physical Education accounted for more than half of his time. Johnson testified that Intrieri did not receive any additional money for serving as the Assistant Coordinator of State and/or Federally Aided Programs and the Chairperson of the District's Safety Committee.

Finally, the responsibilities that had been previously delegated to the Plaintiff pursuant to his position as Director of Health were assumed by two secondary school Principals.

Due to Intrieri's appointment to Director of Physical Education, and Pascarella and Miller replacing her as a physical education teacher, the District saved $351,907 over the course of the 2013–14 and 2014–15 school years. While the Plaintiff states that he is unable to dispute the validity of these assertions, he does not dispute that these individuals made the salaries listed above. However, as stated above, the District's budget increased 2.99% between 2012–13 and 2013–14, more than the 2% increase that was sought by the Governor's office.

### 5. Other Relevant Terminations and Resignations

Assistant Superintendent of Curriculum & Instruction Stephanie Clagnaz resigned on September 20, 2012; Director of Facilities Peter Cavassa ("Cavassa") resigned on March 19, 2014; Principal Dr. Cheryl Scheidet resigned on April 4, 2013 and retired; and Principal David Evans ("Evans") was terminated on April 18, 2013. Clagnaz, Cavassa Scheidet, and Evans are all Caucasian, did not file any claims against the District asserting that they were victims of discrimination. Cavassa was replaced by Matt Lukoschevitz, who is Caucasian.

Evans and Cavassa each submitted affidavits wherein they stated that Caucasian employees were treated differently than black and African American employees. While both Cavassa and

Evans mentioned specific individuals who they believed were victims of discrimination, the statements are made in a conclusory fashion. Cavassa said that he received heightened scrutiny, whereas black employees did not. Evans stated broadly that he did not receive any grant money, and black and African American employees did. Cavassa also included statements that include double hearsay, which the Court does not consider. (Pl.'s Ex. 9 ¶ 9).

Cavassa also stated that around July 2013, he witnessed Cross tell District contractors that she "wanted black workers." (*Id.* ¶ 10). Despite the fact that the contractors were Hispanic, Cross pointed to her hand, and said "No, my people." (*Id.*). Evans stated that during the fall of the 2011– 12 school year, Cross stated at a Board meeting that "we need to go back to the old times when this place was black." (Pl.'s Ex. 10 ¶ 4).

Both Evans and Cavassa stated that they felt they were being discriminated against generally based on their race, but did not say that they were forced out or terminated because of their race.

While the Plaintiff testified as to statements made by Scheidet, Clagnaz, Cavassa, and Assistant Superintendent of Business Robert Geras regarding their feelings that they were being forced out, those statements are all hearsay, and are inadmissible. *See generally* FED. R. EVID. 802.

> Plaintiff also testified, in a conclusory fashion, that
>
> there was an ongoing pattern of harassment against white administrators in the district that [existed] while [Johnson] was the superintendent. . . . [A]ll the non-black administrators were either beginning to be pushed out of their jobs or were being given additional assignments or being written up, where their black counterparts were not being assigned or written up.

(Pl.s' 56.1 ¶ 81). The Court notes that the Plaintiff did not identify specific employees to compare how they were treated differently.

On the same day that the Board approved the termination of Evans, it approved the termination of two high school principals who are both African American, and an elementary school principal, who is Hispanic.

Evans, along with several of the other principals who were terminated, brought an Article 78 action against the District alleging that their terminations were arbitrary and capricious.

**6. The Plaintiff Applies for Other Positions**

In June of 2013, the District posted an opening for the Assistant Superintendent for Special Education. The Plaintiff did not apply for this position.

Between October 6, 2014 and May 26, 2015, the Plaintiff applied for positions as Dean of Students, Enrollment Ombudsman, Assistant Enrollment Ombudsman, Elementary School Principal, and Middle School Principal, but was not hired for any of those positions.

The District hired two High School Deans—O'Neill Glenn ("Glenn"), a younger African American man, and Betsy Benedith ("Benedith"), an African American woman. The Plaintiff, without citing to any evidence in support, claims that Glenn was less experienced. The Plaintiff does not claim that Glenn was not qualified, or that the Plaintiff was more qualified. Glenn served for four years as an assistant principal in the Bronx. For her part, Benedith previously served as an assistant principal and Dean of Students. The Plaintiff has never served as an assistant principal, or as a principal.

While the Defendants present evidence that certain individuals were hired to fill the positions of High School Associate Assistant Principal (Rachel Blount) and High School Assistant Principal (Carey Gray), there is no evidence that the Plaintiff applied for those jobs. Furthermore, although the Plaintiff testified that he remembered applying for the assistant principal of an

elementary school, there is no evidence as to who received that job.  The Plaintiff testified that he could not remember the other positions to which he applied.

Johnson testified that she was aware that the Plaintiff applied for the ombudsman position, but was not aware that he had applied for other positions.  The New York State Attorney General had determined that the District was in violation of enrollment practices, and directed the District to create and pay for the position of enrollment ombudsman.  The Board would recommend individuals, but the Attorney General would ultimately select the ombudsman.  The ombudsman posting indicated that the District had a preference for a bilingual speaker.  The Plaintiff does not speak Spanish.  It is unclear who ultimately received the position, but it was not the Plaintiff.

### 7. Plaintiff Recalled to His Previous Position

On July 8, 2015, Assistant Superintendent Rodney Gilmore sent a letter to the Plaintiff stating that the Superintendent would recommend to the Board at their August 20, 2015 meeting that the Plaintiff be recalled from the excess list and be reinstated to his previous position.  The Plaintiff wrote back stating that he would return.  On August 20, 2015, the Board voted to recall the position and appoint him to be Director of Athletics, Physical Education, Health and Chairperson Districtwide Health and Safety Team.

### 8. Excessing in the Ensuring School Years

During the June 19, 2014 Board meeting, the Board approved Johnson's recommendation to excess fifty-nine (59) District positions for the 2014–15 school year.  This included administrative positions such as the Director of Guidance and Secondary Assistant Principal.

During the June 18, 2015 Board meeting, the Board  approved Johnson's recommendation to excess sixty (60) District positions for the 2015–16 school year.  This included administrative positions such as the Executive Director for School Improvement, Accountability and Funded

Programs, the Executive Director for Bilingual Education, ESL and LOTE, the Director of ELA and Reading, the Director of Mathematics and Business, the Director of Science, the Director of Social Studies, and the Secondary Assistant Principal.

**B.  The Relevant Procedural History**

On September 19, 2013, the Plaintiff sent the District a Notice of Claim asserting claims against the District for race, age, and disability discrimination in connection with the District's decision to terminate his employment.

Sometime before October 11, 2013, the District apparently requested an administrative hearing pursuant to Section 50-h of the New York General Municipal Law.  Under that statute, municipal entities, including school districts, have a "right to demand an examination of the claimant relative to the occurrence and extent of the injuries or damages for which claim is made . . . ."  N.Y. GEN. MUN. § 50-h(1).  These hearings are sometimes referred to as 50-h hearings.

On October 11, 2013, the District held a 50-h hearing.  Following the hearing, the District declined to settle the Plaintiff's claims.

On May 29, 2014, the Plaintiff filed a complaint against the District with the New York State Division of Human Rights ("NYSDHR"), asserting claims for race, age, and disability discrimination.  On the same day, the Plaintiff filed a charge with the EEOC.

On November 25, 2014, the NYSDHR found that probable cause existed to believe that the District was engaging in discriminatory practices.

On August 17, 2015, the Plaintiff commenced this action against the District by filing a complaint.  He asserted eight separate causes of action for age discrimination in violation of the Age Discrimination in Employment Act, 29 U.S.C. §621 et seq. ("AEDA") and the New York

State Human Rights Law (the "NYSHRL"); race discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e et seq. ("Title VII") and the NYSHRL; retaliation in violation of Title VII and the NYSHRL; and disability discrimination in violation of the Americans with Disability Act, 42 U.S.C. 12111 et seq. ("ADA") and the NYSHRL. In connection with these claims, he sought compensatory damages; liquidated damages; back pay; front pay; general and special damages to compensate him for lost compensation and benefits; punitive damages; attorneys' fees; interest; and costs.

On October 21, 2015, the District filed a motion pursuant to Rules 12(b)(4), 12(b)(5), and 12(b)(6) to dismiss the original complaint. In its memorandum of law, the District asserted that the Plaintiff's federal and state discrimination claims were all time-barred.

On November 3, 2015, the Court so-ordered a stipulation by the parties to extend the Plaintiff's time to respond to the District's motion from November 4, 2015 to November 18, 2015.

On November 18, 2015, the Plaintiff filed an amended complaint adding the individual Defendants to the action. In addition, the Plaintiff withdrew his claims under Title VII, the ADEA, and the ADA. He added claims under Section 1983, asserting that the Defendants violated his Fourteenth Amendment rights "by engaging in unlawful discriminatory practices by its policymakers in voting to terminate the Plaintiff." (Am. Compl. ¶¶ 48–50). In so doing, the Plaintiff brought a *Monell* claim against the District, and Section 1983 claims against the individual Defendants. In addition, he continued to assert that the Defendants violated Section 296 of the NYSHRL "by engaging in unlawful discriminatory practices in voting to approve the termination of the Plaintiff." (*Id.* ¶ 51).

On November 25, 2015, the Defendants filed a letter request to withdraw their first motion to dismiss without prejudice in light of the amended complaint, which the Court so-ordered on April 4, 2016.

On December 3, 2015, the Defendants filed a motion to dismiss the amended complaint pursuant to Rules 12(b)(4), 12(b)(5), and 12(b)(6).

On August 30, 2016, the Court granted in part, and denied in part the Defendants' second motion to dismiss. The Court dismissed the Plaintiff's NYSHRL claims, but held that the Plaintiff alleged sufficient facts to plausibly plead his Section 1983 claims. Relevant here, the Court found that it could not definitively rule, based on the amended complaint, whether the Defendants were entitled to legislative immunity. Based on the allegations contained in the complaint, the Court found that the Plaintiff plausibly alleged that "the Board's vote was more akin to a 'discretionary personnel decision,' which the Second Circuit has made clear 'does not give rise to immunity because such decisionmaking is no different in substance from that which is enjoyed by other actors.'" (Mem. of Dec. and Order of Aug. 30, 2016, Dkt. No. 39 at 29 (quoting *Harhay v. Town of Ellington Bd. of Educ.*, 323 F.3d 206, 210–11 (2d Cir. 2003) (internal alterations omitted))). The Court specifically noted that "absent from the record is evidence suggesting that the Plaintiff's termination came at the heels of a District-wide effort to eliminate teaching jobs for budgetary reasons . . . ." (*Id.* at 28–29 (internal citation omitted)). However, the Court noted that its decision did not preclude the Defendants from raising the issue of legislative immunity at the summary judgment stage after discovery. (*Id.* at 29).

On November 21, 2016, the Defendants filed an answer to the amended complaint.

On September 15, 2017, the Defendants filed the instant motion for summary judgment seeking dismissal of the Plaintiff's Section 1983 claims, which are his sole remaining claims. The

Defendants argue that the individual Defendants are entitled to legislative immunity; that the Plaintiff cannot show that his termination occurred under circumstances giving rise to an inference of discrimination; that the Defendants' proffered reason for his termination is not pretextual; that the Plaintiff's *Monell* claim against the District fails because he has failed to identify a policy, custom or practice; and that the Plaintiff's claim for discrimination based on the District' failure to promote him is similarly flawed.

## II.  DISCUSSION

### A.  The Legal Standard

Pursuant to Rule 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  When deciding a motion for summary judgment, "[t]he Court 'must draw all reasonable inferences and resolve all ambiguities in favor of the non–moving party.'"  *Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.*, 150 F.3d 132, 137 (2d Cir. 1998) (quoting *Garza v. Marine Transp. Lines, Inc.*, 861 F.2d 23, 26 (2d Cir. 1998)).

"[A]t the summary judgment stage the judge's function is not [] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Redd v. N.Y. State Div. of Parole*, 678 F.3d 166, 173–74 (2d Cir. 2012) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986) (internal quotation marks omitted)).  In other words, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."  *Barrows v. Seneca Foods Corp.,* 512 F. App'x 115, 117 (2d Cir. 2013) (quoting *Redd,* 678 F.3d at 174 (internal quotation marks omitted)).  The Court should not attempt to resolve issues of fact,

but rather "assess whether there are any factual issues to be tried." *Cuff ex rel. B.C. v. Valley Cent. Sch. Dist.,* 677 F.3d 109, 119 (2d Cir. 2012).

The movant has the burden of demonstrating the absence of genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). If a nonmoving party fails to make a sufficient showing on an essential element of their case where they will have the burden of proof, then summary judgment is appropriate. *Id.* at 323. If the nonmoving party submits evidence which is "merely colorable," legally sufficient opposition to the motion for summary judgment is not met. *Liberty Lobby,* 477 U.S. at 249. The mere existence of a scintilla of evidence in support of the nonmoving party's position is insufficient; there must be evidence on which the jury could reasonably find for that party. *See Dawson v. Cty. of Westchester,* 373 F.3d 265, 272 (2d Cir. 2004).

**B.  As To Whether the Individual Defendants are Entitled to Legislative Immunity in Regards to Their Decision to Excess His Position**

The Defendants argue that the individual Defendants are entitled to absolute legislative immunity for their decision to terminate the Plaintiff's position because his position was excessed as part of a broad effort to reduce the District's budget by excessing multiple employees. For his part, the Plaintiff contends that this Court already held that the Defendants are not entitled to legislative immunity, and that the Board's decision to terminate him was administrative and not legislative in nature. The Court finds that it explicitly held that the Defendants were permitted to raise the issue of legislative immunity at the summary judgment stage, and that they are entitled to absolute legislative immunity.

"The principle that legislators are absolutely immune from liability for their legislative activities has long been recognized in Anglo–American law." *Bogan v. Scott-Harris*, 523 U.S. 44, 48, 118 S. Ct. 966, 970, 140 L. Ed. 2d 79 (1998). The Supreme Court has extended absolute

immunity to local legislators, as well as administrative employees, and held that they are "absolutely immune from suit under § 1983 for their legislative activities." *Id.* at 49, 118 S. Ct. 970; *see also Harhay*, 323 F.3d at 210 ("This Circuit has previously held that absolute legislative immunity for Section 1983 actions extends to local legislators.").

To determine whether a legislator is entitled to legislative immunity, the Court must engage in a "functional" analysis to consider whether the officials' actions were truly legislative. That is, "whether the actions bore all of the hallmarks of traditional legislation, including whether they reflected discretionary, policymaking decisions, implicating the budgetary priorities of the government and the services the government provides to its constituents." *State Employees Bargaining Agent Coalition v. Rowland,* 494 F.3d 71, 89 (2d Cir. 2007) (internal citations and quotation marks omitted).

In conducting this analysis, a Court may not consider the officials' motives. *Id.*; *see also Bernard v. Cty. of Suffolk*, 356 F.3d 495, 505 (2d Cir. 2004) ("[A]n 'unworthy purpose' cannot defeat absolute legislative immunity as long as the challenged conduct is even arguably within delegated legislative powers and does not usurp the role of other branches of government." (internal citations omitted)); *S. Lyme Prop. Owners Assoc. v. Town of Old Lyme,* 2008 WL 323258, at *10 (D. Conn. Feb.4, 2008) ("The enforcement policies may have been flawed, and the Defendant [municipal legislators] may have acted in bad faith, as is alleged by Plaintiffs, but legislative immunity is absolute and does not depend on these considerations.").

Here, the Plaintiff's position was eliminated due to excessing. Thirteen other individuals' positions were also excessed by the Board. The Board voted to approve the excessing of all of these individuals as part of its 2013–14 budgetary process.

Personnel decisions are administrative, and therefore not part of a broader legislative policy, if they are directed at a particular employee. *Almonte v. City of Long Beach*, 478 F.3d 100, 108 (2d Cir. 2007); *see also Harhay*, 323 F.3d at 211 ("The Board members are not entitled to absolute legislative immunity because their acts were not quintessentially legislative, but rather were part of a process by which an employment situation regarding a single individual was resolved."); *Ramirez v. Hempstead Union Free Sch. Dist. Bd. of Educ.*, 33 F. Supp. 3d 158, 174 (E.D.N.Y. 2014) (holding on a motion to dismiss that a local school board's vote to terminate a single individual was administrative, and not legislative in function).

In contrast, terminations of positions and votes based on budgetary constraints are legislative in nature. *Bogan,* 523 U.S. at 55–56, 118 S. Ct. 966 ("The ordinance reflected a discretionary, policymaking decision implicating the budgetary priorities of the city and the services the city provides to its constituents. Moreover, it involved the termination of a position, which, *unlike the hiring or firing of a particular employee,* may have prospective implications that reach well beyond the particular occupant of the office . . . . Thus, petitioners' activities were undoubtedly legislative." (emphasis added)); *Almonte*, 478 F.3d at 103 (stating that the district court correctly found that legislative immunity applied to the city councilmembers' "vote on the budgetary resolutions that terminated the budget lines for the Plaintiffs' positions").

First, as to the Plaintiff's contention that this Court previously held that the individual Defendants are not entitled to legislative immunity, as stated above, the Court did not so hold. Instead, relying solely on the allegations contained in the Plaintiff's complaint, and drawing all inferences in his favor, the Court found that it could "[]not state as a matter of law that the Individual Defendants are entitled to absolute legislative immunity," but that the Court's holding

did not preclude the Defendants from raising the issue again after discovery. (Mem. of Dec. and Order of Aug. 30, 2016, Dkt. No. 39 at 29).

Based on the evidence now before the Court, the Court is able to say as a matter of law that the individual Defendants *are* entitled to absolute legislative immunity. Johnson submitted a budget proposal that included excessing several positions, including the Plaintiff's, to save money. The Board voted to approve the Superintendent's proposed budget. The Board's vote was not directed at the Plaintiff, and did not relate solely to the Plaintiff's position. The Board voted to terminate all of the excessed employees on a single consent docket. The motives for the Board's vote are irrelevant for the purposes of determining whether the individual Defendants are entitled to legislative immunity.

This finding is consistent with the holdings of courts in this circuit that have considered similar factual circumstances. *See Olma v. Collins*, 499 F. App'x 98, 100 (2d Cir. 2012) (summary order) (members of county legislature entitled to legislative immunity where plaintiff's position was eliminated by the passing of a budget amendment); *Almonte*, 478 F.3d at 107 (holding that legislators were entitled to legislative immunity where plaintiffs' positions were terminated through a budgetary resolution vote); *Knox v. Town of Se.*, No. 11 CIV. 8763 ER, 2014 WL 1285654, at *5 (S.D.N.Y. Mar. 31, 2014) ("Defendants' actions of voting on the 2011 Budget eliminating Plaintiff's position, as well as four additional positions within the Town, for budgetary and efficiency reasons . . . were 'quintessentially legislative.' The passage of the 2011 Budget was clearly not an administrative personnel decision directed solely at Plaintiff and his employment. Rather, the Budget was part of a 'broader legislative policy' that, for legitimate budgetary and efficiency purposes, eliminated various positions within the Town." (internal citation omitted)), *aff'd*, 599 F. App'x 411 (2d Cir. 2015); *Zdziebloski v. Town of E. Greenbush, N.Y.*, 336 F. Supp.

2d 194, 203 (N.D.N.Y. 2004) (town board's decision to pass a resolution eliminating seven positions from town government was entitled to absolute legislative immunity).

This also applies to Johnson, who was superintendent at the time. *See Bogan,* 523 U.S. at 55, 118 S. Ct. 966 (finding that mayor's introduction of budget was legislative, even though mayor was an executive official); *Rini v. Zwirn*, 886 F. Supp. 270, 283 (E.D.N.Y. 1995) ("Active participation in the legislative process entitles an executive to absolute immunity." (internal citation omitted)); *Orange v. Cty. of Suffolk*, 830 F. Supp. 701, 706 (E.D.N.Y. 1993) (county executive entitled to legislative immunity for act of signing resolution eliminating county civil service positions).

The fact that many of the budgetary talks took place in "executive session" does not change the Court's finding. The Second Circuit has held that "legislative immunity cloaks not only the vote on the budgetary resolutions, but also any discussions the [Board] members may have held, and any agreements they may have made, regarding the new budget in the months preceding the actual vote. That the discussions and agreements occurred in secret does not strip these activities of their legislative function." *Almonte*, 478 F.3d at 107.

Therefore, all of the individual Defendants are entitled to absolute legislative immunity. Accordingly, the Defendants' motion for summary judgment dismissing the Plaintiff's 1983 claims against the individual Defendants based on the Board's vote to excess his position is granted.

However, this does not entirely dispose of the Plaintiff's discriminatory termination claims. The Plaintiff's *Monell* claim against the District is based upon the Board's vote to terminate him. Legislative immunity is a personal defense that can be claimed by individuals sued in their personal capacity. It does not apply to claims against officials in their official capacity, or against

municipalities. *Almonte*, 478 F.3d at 106 ("Immunity, either absolute or qualified, is a *personal* defense that is available only when officials are sued in their individual capacities; the immunities officials enjoy when sued personally do not extend to instances where they are sued in their official capacities." (internal citations, quotation marks, and alterations omitted)); *see also Goldberg v. Town of Rocky Hill,* 973 F.2d 70, 73–74 (2d Cir. 1992) (explaining that an official-capacity claim is in substance a claim against the municipality, which cannot assert immunity, either absolute or qualified, as a defense to liability under 42 U.S.C. § 1983).

In order to determine whether the District can be held liable pursuant to *Monell*, the Court must first consider whether the Plaintiff suffered a constitutional violation. *See Matican v. City of N.Y.*, 524 F.3d 151, 154 (2d Cir. 2008) (explaining that if there is no constitutional violation by a governmental actor, a city cannot be liable "regardless of whether the officers acted pursuant to a municipal policy or custom"). Therefore, the Court will now address the merits of the Plaintiff's Equal Protection claim premised upon his termination.

## C.  As to the Merits of the Plaintiff's Equal Protection Claim Based Upon His Termination

The Plaintiff alleges that his termination was based in whole or in part on age and/or racial discrimination. The Defendants argue that the Plaintiff cannot present a *prima facie* case as to either type of discrimination because he has failed to present sufficient facts to raise an inference of discrimination. Furthermore, they contend that the Plaintiff cannot show that their proffered non-discriminatory reason was pretextual. The Plaintiff opposes both of these points. The Court finds that the Plaintiff has failed to present a *prima facie* case of age discrimination, but has presented sufficient evidence related to his racial discrimination claim.

"A § 1983 claim has two essential elements: (1) the defendant acted under color of state law; and (2) as a result of the defendant's actions, the plaintiff suffered a denial of h[is] federal

statutory rights, or h[is] constitutional rights or privileges." *Annis v. Cty. of Westchester*, 136 F.3d 239, 245 (2d Cir. 1998). "Most of the core substantive standards that apply to claims of discriminatory conduct in violation of Title VII are also applicable to claims of discrimination in employment in violation of [] [] the Equal Protection Clause . . . ." *Patterson v. Cty. of Oneida, N.Y.*, 375 F.3d 206, 225 (2d Cir. 2004) (citing *Jemmott v. Coughlin,* 85 F.3d 61, 67 (2d Cir. 1996) ("[W]hen § 1983 is used as a parallel remedy with Title VII in a discrimination suit, as it is here, the elements of the substantive cause of action are the same under both statutes."); *Sorlucco v. New York City Police Department,* 888 F.2d 4, 6–7 (2d Cir. 1989) (same) (further internal citations omitted)).

"Title VII claims for disparate treatment parallel the equal protection claims brought under § 1983. The elements of one are generally the same as the elements of the other and the two must stand or fall together." *Demoret v. Zegarelli*, 451 F.3d 140, 153 (2d Cir. 2006) (quoting *Feingold v. New York,* 366 F.3d 138, 159 (2d Cir. 2004) (internal quotation marks omitted)). "[T]he difference being that a § 1983 claim, unlike a Title VII claim, can be brought against individuals." *Id.* at 149.

In order to establish a *prima facie* case of intentional discrimination, the Plaintiff must present evidence from which a reasonable jury could find four elements: "(1) that he belonged to a protected class; (2) that he was qualified for the position he held; (3) that he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Holcomb v. Iona College,* 521 F.3d 130, 138 (2d Cir. 2008). A plaintiff's burden at the *prima facie* stage to offer evidence of circumstances giving rise to an inference of discrimination is "'minimal' and '*de minimis.*'" *Zimmermann v. Assocs. First Capital Corp.,* 251 F.3d 376, 381 (2d Cir. 2001) (quoting *Byrnie v. Town of*

*Cromwell,* 243 F.3d 93, 101 (2d Cir. 2001); *Abdu–Brisson v. Delta Air Lines, Inc.,* 239 F.3d 456, 467 (2d Cir. 2001)).

Once a plaintiff establishes a *prima facie* case of discrimination, "the burden of production [shifts] to the defendant, who must proffer a 'legitimate, nondiscriminatory reason' for the challenged employment action." *Woodman v. WWOR–TV, Inc.,* 411 F.3d 69, 76 (2d Cir. 2005) (quoting *Slattery v. Swiss Reinsurance Am. Corp.,* 248 F.3d 87, 91 (2d Cir. 2001)). If the defendant articulates a legitimate, nondiscriminatory reason, plaintiff must then prove that defendant's articulated reasons are "pretextual." *Woodman,* 411 F.3d at 76. However, as the Second Circuit has noted, "pretext" in this context does not mean that the Plaintiff must show that the Defendants' proffered reason was false. *Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 156 (2d Cir. 2010). Instead, to defeat summary judgment at this stage, "a plaintiff need only show that the defendant was in fact motivated at least in part by the prohibited discriminatory animus." *Id.*at 156; *see also Univ. of Texas Sw. Med. Ctr. v. Nassar,* 570 U.S. 338, 343, 133 S. Ct. 2517, 2522–23, 186 L. Ed. 2d 503 (2013) ("An employee who alleges status-based discrimination under Title VII . . . [must] show that the motive to discriminate was one of the employer's motives, even if the employer also had other, lawful motives that were causative in the employer's decision.").

### 1. The Plaintiff's Age Discrimination Claim

As to the Plaintiff's age discrimination claim, the Court agrees with the Defendants. To raise an inference of discrimination, a plaintiff must show that his employer "treated [her] less favorably than a similarly situated employee outside his protected group." *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000); *Norville v. Staten Island Univ. Hosp.,* 196 F.3d 89, 95 (2d Cir. 1999); *Shumway v. United Parcel Serv., Inc.,* 118 F.3d 60, 63 (2d Cir. 1997). When the Plaintiff was terminated as a result of his position being excessed, his responsibilities were

subsumed by Hill and Intrieri, both of whom were over fifty at the time. The Plaintiff does not offer any other similarly situated comparable individuals. Therefore, the Plaintiff cannot show that his termination occurred under circumstances giving rise to an inference of age discrimination. *See Zito v. Fried, Frank, Harris, Shriver & Jacobson, LLP*, 869 F. Supp. 2d 378, 395 (S.D.N.Y. 2012) (finding that where the defendants had retained employees who were of the same gender as the plaintiff and who were older than she was, "no inference of age or gender discrimination can be drawn"); *see also Bay v. Times Mirror Magazines, Inc.,* 936 F.2d 112, 118 (2d Cir. 1991) (finding the retention of three older employees relevant to the plaintiff's age discrimination claim).

Therefore, the Plaintiff has failed to present a *prima facie* case of age discrimination. Accordingly, the Defendants' motion for summary judgment dismissing that claim is granted.

### 2. The Plaintiff's Racial Discrimination Claim

#### a. As to Whether the Plaintiff Presents a *Prima Facie* Case of Racial Discrimination

The question of racial discrimination is a closer one. As stated above, the Plaintiff's responsibilities were assumed by Intrieri and Hill. While Intrieri is white, Hill is an African-American woman. Courts have drawn an inference of discrimination where an individual was replaced by someone outside of his protected class. *Dabney v. Christmas Tree Shops,* 958 F. Supp. 2d 439, 451 (S.D.N.Y. 2013) ("It is well settled . . . that the mere fact that a plaintiff was replaced by someone outside the protected class will suffice to establish the required inference of discrimination at the *prima facie* stage." (quoting *Zimmermann*, 251 F.3d at 381 (internal quotation marks omitted))); *see also Thomas v. iStar Fin., Inc.,* 438 F. Supp. 2d 348, 359 (S.D.N.Y. 2006) (*prima facie* case established where an African–American man was replaced by a white woman), *aff'd,* 629 F.3d 276 (2d Cir. 2010); *Carlton v. Mystic Transp., Inc.,* 202 F.3d 129, 135 (2d Cir. 2000) (inference of age discrimination raised where the 57–year old plaintiff was replaced by

two substantially younger employees).  Where an individual was replaced by someone within his or her protected class, that fact typically weighs against an inference of discrimination.  *Montanile v. Natl. Broadcast Co.,* 211 F. Supp. 2d 481, 487 (S.D.N.Y. 2002) ("That a plaintiff is replaced by another in the same protected class weighs heavily against the inference that she suffered discrimination.").

As two individuals "replaced" the Plaintiff, and one of them was within his protected class, the Court cannot say that this fact alone gives rise to an inference of discrimination.  However, when coupled with other facts, the Court finds that the Plaintiff has introduced sufficient evidence to shift the burden to the Defendants to proffer a legitimate, non-discriminatory explanation for his termination.

While the Defendants are correct that "we have not come to the point where the mere collective race of a decision-making body is sufficient to mark it as acting for race-motivated reasons," (Defs.' Reply Mem. of Law at 4), the Court considers the fact that the Board and the Superintendent were all black as circumstantial evidence supporting an inference of discrimination, *see Benedith v. Malverne Union Free Sch. Dist.,* 38 F. Supp. 3d 286, 318 (E.D.N.Y. 2014) (Spatt, J.) (considering, as "circumstantial evidence" for a *prima facie* case of race discrimination, the fact that when an African American employee was terminated, "ten of the eleven District Administrators were white," in addition to the essential fact that "after [the plaintiff's] termination, her job duties . . . were assumed by [another individual], who is white").  While the racial makeup of a decision making body is insufficient standing alone to raise an inference of discrimination, *Howard v. City of New York*, 602 F. App'x 545, 548 (2d Cir. 2015), the Court considers the fact in light of the other evidence.

To that end, the Plaintiff has introduced evidence of racially charged comments from several individuals. The Plaintiff mostly relies on statements from lower-level employees who did not have decision-making authority. Despite the fact that some of these employees "may" have had "access" to the Board and the Superintendent, these comments do not give rise to an inference of discrimination. These individuals were not decision makers, and there is no evidence beyond conjecture that they exerted any influence over decision makers. *See Howard*, 602 F. App'x at 547 ("[A]s the district court correctly concluded, the park attendant's alleged racial comment did not raise a triable issue of discrimination because the attendant had no decision-making authority in terminating Howard's permit and Howard proffered no evidence beyond mere speculation tying this statement to any decision maker." (internal citations omitted)); *Tomassi v. Insignia Fin. Grp.,* 478 F.3d 111, 115 (2d Cir. 2007) (holding that remarks by someone other than a decision maker "may have little tendency to show that the decision-maker was motived by the discriminatory sentiment expressed in the remark"), *abrogated on other grounds by Gross v. FBL Fin. Servs., Inc.,* 557 U.S. 167, 177–78, 129 S. Ct. 2343, 174 L. Ed. 2d 119 (2009). Similarly here, the Plaintiff did not offer any evidence beyond speculation that the lower level employees influenced the individual Defendants in any way.

However, the Plaintiff did introduce evidence that Cross made comments regarding the Plaintiff's race. Cross purportedly directly referenced the Plaintiff's race; commented on the fact that he was not from the more racially diverse town of Hempstead; contrasted the Plaintiff's race with that of his students by noting that he was an overseer who stood around and watched black kids play; and referred to him as "Mr. Man." Days before the Board voted to excess the Plaintiff's position, Cross said to Simmons, "we gotta get rid of [the Plaintiff]." (Pl.'s Ex. 1 at 103). The year before the Plaintiff was terminated, Cross said at a Board meeting that "we need to go back

to the old times when this place was black." (Pl.s' Ex. 10 ¶ 4). Approximately one month after the Plaintiff was excessed, Cross told a group of contractors that she wanted black contractors.

Cross was a member of the board; in that way, she was a decision-maker who had influence over the Plaintiff's employment. The content of the remarks, as well as their source, weigh in favor of finding that the remarks are probative of discrimination. *Owens v. N.Y.C. Hous. Auth.,* 934 F.2d 405, 410 (2d Cir. 1991) (holding that discriminatory remarks by "individuals with substantial influence over [the plaintiff's] employment" are relevant in determining whether an employment decision was motivated by discriminatory animus); *Eldaghar v. City of N.Y. Dep't of Citywide Admin. Servs*., No. 02–CV–9151, 2008 WL 2971467, at *9 (S.D.N.Y. July 31, 2008) (holding that a jury could reasonably find discriminatory motivation based on oral comments by plaintiff's supervisors who had a substantial influence over plaintiff's employment); *Greenbaum v. Handelsbanken*, 67 F. Supp. 2d 228, 253–54 (S.D.N.Y. 1999) ("[C]omments by high-ranking officials . . . are admissible as . . . evidence suggesting that there is a particular [discriminatory] corporate atmosphere in which decisions are made.").

However, it is unclear when the racially charged statements directed at the Plaintiff were made, as Cincotta stated that they occurred over the course of seven years. Courts have consistently found that remarks far removed in time from the decision making process do not raise an inference of discrimination. *See Sethi v. Narod*, 12 F. Supp. 3d 505, 540 (E.D.N.Y. 2014) ("District courts in this Circuit have found that a three-month lapse between alleged discriminatory statements and an adverse employment action is too long a gap to find the remark probative of discrimination." (collecting cases)). Furthermore, while Cross was a decision maker as a member of the Board, she was only one of five members of the Board. *See Barbano v. Madison Cnty., 922 F.2d 139, 142 (2d Cir. 1990) ("[D]iscrimination by one individual does not necessarily imply that

a collective decision-making body of which the individual is a member also discriminated."). Additionally, Cross voted in 2008 to award tenure to the Plaintiff, which weighs against finding that the comments give rise to an inference of discrimination. *See* G*rady v. Affiliated Cent. Inc.*, 130 F.2d 553, 560 (2d Cir. 1997) ("When the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute . . . an invidious motivation that would be inconsistent with the decision to hire."). Nevertheless, the Court does not rely on these remarks alone. Instead, the remarks are circumstantial evidence that support an inference of discrimination along with the facts mentioned above.

As the Court has repeatedly stated, it is a close issue as to whether the circumstances surrounding the Plaintiff's termination give rise to an inference of discrimination. Standing alone, Cross' remarks, the racial makeup of the Board, and the fact that one of the two people who replaced the Plaintiff was of a different race would be insufficient to find an inference of racial discrimination. However, taken together, the Court finds that the circumstantial evidence is sufficient to support an inference of discrimination. Therefore, the Court finds that the Plaintiff has presented a *prima facie* case of racial discrimination.

As the Defendants have proffered a legitimate, non-discriminatory reason for the Plaintiff's termination, the Court next considers whether it was pretextual.

### ii. As to Whether the Defendants' Proffered Reason for the Plaintiff's Termination Was Prextextual

Once a defendant offers a legitimate non-discriminatory reason, a plaintiff must offer evidence from which a reasonable jury could conclude, by a preponderance of the evidence, that discrimination played a role in the adverse action taken by the defendant. *Holcomb,* 521 F.3d at 141. A "plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the

prohibited factor was at least one of the 'motivating' factors." *Id.* at 138 (quoting *Cronin v. Aetna Life Ins. Co.,* 46 F.3d 196, 203 (2d Cir. 1995)). At this stage of the burden-shifting analysis, "[c]onclusory and speculative allegations will not suffice to demonstrate discriminatory intent." *Henny v. New York State,* 842 F. Supp. 2d 530, 553 (S.D.N.Y. 2012).

At the pretext stage, "[a] court may re-consider evidence presented to find an inference of discrimination at the prima facie stage." *Ingenito v. Riri USA, Inc.,* No. 11–CV–2569, 2013 WL 752201, at *12 (E.D.N.Y. Feb. 27, 2013); *see also Sista v. CDC Ixis N. Am., Inc.,* 445 F.3d 161, 173 (2d Cir. 2006) (holding that a plaintiff may demonstrate pretext "either by the presentation of additional evidence showing that the employer's proffered explanation is unworthy of credence, or by reliance on the evidence comprising the prima facie case, without more"); *Back v. Hastings on Hudson Union Free Sch. Dist.,* 365 F.3d 107, 124 (2d Cir. 2004) ("[T]he plaintiff may, depending on how strong it is, rely upon the same evidence that comprised her prima facie case, without more."). However, "[t]he burden of establishing is pretext is higher than that required to establish a prima facie case of discrimination." *Geras v. Hempstead Union Free Sch. Dist.*, 149 F. Supp. 3d 300, 328 (E.D.N.Y. 2015)

The Defendants state that they excessed the Plaintiff because they needed to save money. It is clear that the District saved some money by excessing the Plaintiff's position and having two other individuals assume his duties. However, the Plaintiff does not need to prove that the Defendants' proffered explanation is false, only that discrimination played a part in the decision. *Henry*, 616 F.3d at 156 ("A plaintiff has no obligation to prove that the employer's innocent explanation is dishonest, in the sense of intentionally furnishing a justification known to be false. The crucial element of a claim under Title VII is discrimination, not dishonesty. We recognize that courts often speak of the obligation on the plaintiff to prove that the employer's explanation

is a 'pretext for discrimination.' We believe this is either a shorthand for the more complex concept that, regardless of whether the employer's explanation also furnished part of the reason for the adverse action, the adverse action was motivated in part by discrimination . . . ." (internal footnote omitted)).

The Defendants chose to excess the Plaintiff, despite the fact that the responsibilities encompassed by the Plaintiff's position would still need to be performed by one person or a number of persons. The Plaintiff's position was the only District-wide position excessed by the Board. While the New York State Commissioner of Education held that it was permissible for the District to abolish the position, and to distribute the responsibilities to different employees, that does not change the fact that the Plaintiff's position was the sole District position that was abolished.

In addition, the Defendants posted positions for which the proposed budget did not account, including the Director of Social Studies, the Director of Technology, and the Director of Engineering. While the Defendants state that these positions were going to be funded by grant monies, the record discloses that the Defendants did not even apply for grants related to those positions until months after they posted them. Furthermore, as the Plaintiff points out, the Defendants did not attempt to fund his position with grant funds. The Defendants claim that the Plaintiff's position could not have been funded by Title I or Title II grants, but they have not presented any admissible evidence showing that the Plaintiff's position could not have been funded through Title II. Indeed, Title II permits Districts to pay for recruitment and retention of educational personnel.

Finally, the individual Defendants stated that the Plaintiff's position was excessed so that the budget would increase only 2% from 2012–13 to 2013-14. However, the record shows that the budget represented a 2.99% increase from the previous year. The Defendants do not explain

why they came up short in trying to meet the 2% target, or why they felt this was permissible. In the Court's view, this would lead a finder of fact to question why the Board was not willing to leave the Plaintiff's position in place since the Board was willing to suffer a larger increase in the budget than that requested by the Governor.

In light of these facts and those discussed in regard to the Plaintiff's *prima facie* case, the Court finds that the Plaintiff has presented "circumstances that would be sufficient to permit a rational finder of fact to infer that [the Defendants'] employment decisions were more likely than not based in whole or in part on discrimination." *Ya-Chen Chen v. City Univ. of New York*, 805 F.3d 59, 74 (2d Cir. 2015) (internal citations and quotation marks omitted).

Therefore, the Court finds that the Plaintiff has presented sufficient facts on his claim for racial discriminatory termination to withstand a motion for summary judgment. The Court accordingly turns to whether the District can be held liable for the Plaintiff's alleged constitutional injury pursuant to *Monell*.

## D. As to the Plaintiff's *Monell* Claim Against the District

It is well-established that "a municipality cannot be held liable under § 1983 on a respondeat superior theory." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691, 98 S. Ct. 2018, 2037, 56 L. Ed. 2d 611 (1978). However, section 1983 "extends liability to a municipal organization where . . . the policies or customs it has sanctioned, led to an independent constitutional violation." *Segal v. City of N.Y.*, 459 F.3d 207, 219 (2d Cir. 2006). "Municipal liability may also be premised on a failure to train employees when inadequate training 'reflects deliberate indifference to . . . constitutional rights.'" *Okin v. Village of Cornwall–On–Hudson Police Dep't*, 577 F.3d 415, 440 (2d Cir. 2009) (quoting *City of Canton v. Harris*, 489 U.S. 378, 392, 109 S. Ct. 1197, 1206, 103 L. Ed. 2d 412 (1989)).

To prevail on a Section 1983 claim against a municipality, a plaintiff must show "that 'action pursuant to official municipal policy' caused the alleged constitutional injury." *Cash v. Cty. of Erie*, 654 F.3d 324, 333 (2d Cir. 2011) (quoting *Connick v. Thompson*, 563 U.S. 51, 60, 131 S. Ct. 1350, 1359, 179 L. Ed. 2d 417 (2011)); *see also Monell*, 436 U.S. at 690–91 ("[L]ocal governments . . . may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels").

> A plaintiff can establish the existence of a municipal policy or custom by showing: the existence of[] (1) a formal policy which is officially endorsed by the municipality; (2) actions taken or decisions made by municipal officials with final decision-making authority, which caused the alleged violation of plaintiff's civil rights; (3) a practice so persistent and widespread that it constitutes a custom of which constructive knowledge and acquiescence can be implied on the part of the policy making officials; or (4) a failure by policymakers to properly train or supervise their subordinates, amounting to deliberate indifference to the rights of those who come in contact with the municipal employees.

*Moray v. City of Yonkers*, 924 F. Supp. 8, 12 (S.D.N.Y. 1996) (internal citations omitted).

Here, the Plaintiff bases his *Monell* claim on, *inter alia*, the Board's vote to terminate the Plaintiff. That is, he claims that the District discriminated against him on the basis of his race, in violation of the Equal Protection Clause, when the Board voted to terminate him.

As stated above, the Court has found that there is a question of material fact as to whether the Board violated the Equal Protection Clause when it voted to terminate the Plaintiff. The Board is the final decision maker in the District. A "single unlawful discharge, if ordered by a person whose edicts or acts may fairly be said to represent official policy, can, by itself support a claim against a municipality." *Back*, 365 F.3d at 128 (citations and quotations omitted); *see also Rookard v. Health and Hospitals Corp.,* 710 F.2d 41, 45 (2d Cir. 1983) ("Where an official has final authority over significant matters involving the exercise of discretion, the choices he makes

represent government policy."); *Weinstein v. Garden City Union Free Sch. Dist.*, No. CV 11-2509 (AKT), 2013 WL 5507153, at *17 (E.D.N.Y. Sept. 30, 2013) (stating the final policymaking body was the Board of Education).

The Board voted to terminate the Plaintiff's position and to delegate his previous responsibilities to two individuals, including one who was outside of his protected class. One member of the Board made racially charged comments; and the entire Board was outside of the Plaintiff's protected class. Furthermore, the Board made the budgetary decisions discussed above in Section II-C-ii.

Therefore, as the Board is the final decision-making body of the District, and the Plaintiff has put forth sufficient evidence to raise a question of material fact as to whether the Board's decision was motivated, at least in part, by discrimination, the Plaintiff's *Monell* claim against the District survives. *See Kantrowitz v. Uniondale Union Free Sch. Dist.*, 822 F. Supp. 2d 196, 217 (E.D.N.Y. 2011) (holding that the plaintiff's *Monell* claim against the District survived where the plaintiff's underlying equal protection claim was based on alleged discriminatory action on the part of the school board and the plaintiff presented sufficient evidence of that claim).

Accordingly, the Defendants' motion for summary judgment dismissing the Plaintiff's *Monell* claim against the District based on his termination is denied.

**E.  As to the Plaintiff's Discriminatory Failure to Hire Claim**

The Defendants argue that the Plaintiff never alleged that the District discriminated or retaliated against him by failing to promote or hire him to any of the positions to which he applied after he was terminated. They state that even if the Plaintiff has brought such allegations, he has failed to present evidence of a *prima facie* case. In opposition, the Plaintiff contends that he was qualified for the positions to which he applied, and that the District's failure to hire him was a

result of discrimination. The Court reads the complaint broadly to find that the Plaintiff has alleged discrimination based on a failure to promote or hire, but finds that the Plaintiff has failed to present sufficient facts to establish a *prima facie* case.

The Plaintiff's complaint enumerates a number of positions to which he applied after he was terminated. (Am. Compl. ¶¶ 39–45). In his "claims for relief" section, he states that the basis for his Section 1983 "include[es], but [is] not limited to" the Board's vote to terminate the Plaintiff. While the Court is troubled by the Plaintiff's failure to clearly include the failure to hire allegations in his claims for relief, the Plaintiff did include the allegations in the factual section of his complaint. Therefore, as the Plaintiff stated in his complaint that his discrimination claims were not limited to his termination, the Court reads the complaint broadly to include a claim for discrimination based on a failure to hire or promote.

A claim for discrimination based on a failure to hire is analyzed under the same standard as that for one based on termination. To present a *prima facie* case, a plaintiff must show that he "(1) is a member of a protected class; (2) was qualified for the position at issue; (3) was denied the position; and (4) that the circumstances of the adverse employment decision give rise to an inference of discrimination." *Mandell v. Cty. of Suffolk*, 316 F.3d 368, 377 (2d Cir. 2003). The fourth element requires the plaintiff to "show []he was similarly situated in all material respects to the individuals with whom []he seeks to compare h[im]self." *Graham*, 230 F.3d at 39 (internal quotation marks omitted). "In the context of a promotion, that means comparing the qualifications of the plaintiff with those of the person promoted. . . . The question is whether selection of a particular candidate for a position, standing alone and in light of his or her qualifications, justifies an inference that race was at least part of the reason for the selection." *Martinez v. Davis Polk & Wardwell LLP*, 208 F. Supp. 3d 480, 487 (E.D.N.Y. 2016), *aff'd*, 713 F. App'x 53 (2d Cir. 2017)

The Plaintiff applied for the positions of Dean of Students, Enrollment Ombudsman, Assistant Enrollment Ombudsman, Elementary School Principal, and Middle School Principal.

At the *prima facie* stage, the burden is on the Plaintiff to show that he was not hired under circumstances giving rise to an inference of discrimination. As stated above, this means comparing himself to those who were hired instead of him. The Plaintiff did not present any evidence as to who specifically received the Enrollment Ombudsman position, Assistant Enrollment Ombudsman position, the Elementary School Principal position, or the Middle School Principal. The Plaintiff testified in a conclusory fashion that all of the positions were filled by African American applicants. (Pl.'s Ex. 1 at 130). Glenn and Benedith were awarded the Dean positions. They each had experience as assistant principals, and Benedith had previously served as a dean. The Plaintiff had never served as an assistant principal or a dean.

Based on these facts, the Plaintiff has failed to present a *prima facie* case of discrimination. He has failed to show that he was similarly situated in all material aspects to those who were hired, and has failed to present any evidence regarding who was hired to several of the positions. *See Gupta v. N.Y. City Sch. Constr. Auth.*, 305 F. App'x 687, 689 (2d Cir. 2008) (affirming dismissal of discrimination claim where plaintiff claimed employees who were promoted or retained were "less academically qualified with less professional experience" and noting that "a party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment" (internal citation and quotation marks omitted)); *Sharpe v. MCI Commc'ns Servs., Inc.*, 684 F. Supp. 2d 394, 405 (S.D.N.Y. 2010) ("[The plaintiff] does not present any concrete facts regarding the training, qualifications, or abilities of the [hired] employees. Indeed, [plaintiff] does not provide any evidence regarding his comparators' education, years of service,

or annual reviews. [Plaintiff's] speculation about his former colleagues' qualifications is thus insufficient to raise an inference of discrimination.").

Furthermore, the Plaintiff has not even presented evidence that he was qualified for any of these positions. The Plaintiff did not produce any evidence regarding the responsibilities of these jobs, or the qualifications that were required. *Breland–Starling v. Disney Publishing Worldwide,* 166 F. Supp. 2d 820, 824 (S.D.N.Y. 2001) ("Plaintiff cannot establish her *prima facie* case without setting forth either the responsibilities of [the] position or plaintiff's skills applicable to this position."). While he did testify that he felt that he was qualified because he had district-level experience, several certificates, and had worked in the District for many years, the "Plaintiff's own subjective assessment of the requirements of another employee's job are not sufficient to create a genuine issue of material fact." *Id.*

Therefore, the Plaintiff has failed to present a *prima facie* case of discrimination regarding his failure to hire claim. Accordingly, the Defendants' motion for summary judgment dismissing that claim is granted.

### III. CONCLUSION

For the reasons stated above, the Defendants' motion is granted in part and denied in part. It is granted to the extent that the Plaintiff's claims for termination based on age discrimination and for discriminatory failure to hire are dismissed, as well as all of the claims against the individual Defendants. The Defendants' motion is denied in that the Plaintiff's *Monell* claim alleging that the District's decision to terminate him was motivated in part by racial discrimination will be presented to the jury.

The official caption is amended to reflect the following:

---------------------------------------------------------X
ROBERT CINCOTTA,

                    Plaintiff,

          -against-

HEMPSTEAD UNION FREE SCHOOL
DISTRICT,

                    Defendant.
---------------------------------------------------------X

          It is **SO ORDERED:**

 Dated: Central Islip, New York

          May 14, 2018

                              __*/s/ Arthur D. Spatt*__

                              ARTHUR D. SPATT

                              United States District Judge